16 F.3d 408
 30 Collier Bankr.Cas.2d 784
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In re Albert Lamar BOND, Jr., Debtor.
OFFICIAL COMMITTEE OF UNSECURED CREDITORS of Albert L. Bond,
Jr., Plaintiff-Appellant,
v.
WHITE PLAINS JOINT VENTURE, Defendant-Appellee,
and
Albert Lamar Bond, Jr., Defendant,
Robert A. Rohrbaugh; United States Trustee, Parties in Interest.
 No. 93-1410.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1993.
Decided Jan. 26, 1994.
 
 1
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Herbert F. Murray, Senior District Judge.
 
 
 2
 Stanton J. Levinson, Bethesda, Maryland, for Appellant.
 
 
 3
 John Sanford Kearns, Upper Marlboro, Maryland, for Appellee.
 
 
 4
 D.Md.
 
 
 5
 AFFIRMED.
 
 
 6
 Before WILKINSON and HAMILTON, Circuit Judges, and NORTON, United States District Judge.
 
 OPINION
 PER CURIAM
 
 7
 The Official Committee of Unsecured Creditors of Albert Bond (the Committee) appeals the bankruptcy court's approval of a settlement agreement (the Agreement) between Albert Bond (the Debtor) and White Plains Joint Venture (WPJV), a secured creditor with a first deed of trust on a 126-acre farm owned by the Debtor. The district court affirmed the approval of this Agreement. Finding no error, we affirm.
 
 
 8
 * This appeal arises from a dispute over the Agreement reached between the Debtor and WPJV. In 1987, the Debtor purchased a 126-acre farm in Charles County, Maryland from WPJV for $400,000. WPJV partially financed the sale, taking a purchase money first deed of trust on the property as security. A special provision in the deed of trust required WPJV to release a particular twenty-five-acre parcel within the 126-acre farm after the Debtor paid $50,000 of the indebtedness. (J.A. 14).
 
 
 9
 The Debtor made one payment of $50,000 before defaulting on the loan. On January 23, 1989, after WPJV declared a default and moved to foreclose, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code.[1] In the bankruptcy proceedings, the Debtor sought to compel the release of the twenty-five-acre parcel, but WPJV refused, contending that the Debtor committed waste or permitted waste on the property and, therefore, materially breached the deed of trust securing WPJV's interest.
 
 
 10
 On March 23, 1989, WPJV filed a motion requesting relief from the automatic stay to permit it to proceed with foreclosure, alleging that the Debtor was in default with respect to WPJV's secured claim. Thereafter, the Debtor's then counsel reached an agreement with WPJV to settle their dispute. As a result of this agreement, counsel for both parties executed a consent order which was accepted by the bankruptcy court on July 13, 1989. The order provided that WPJV would forebear from foreclosing on the property if the Debtor paid all debts owed to WPJV in full by August 28, 1989. If the Debtor failed to do so, WPJV would be permitted to foreclose on the property without further order of the bankruptcy court.[2]
 
 
 11
 The Debtor then retained new counsel who, on July 27, 1989, filed a motion to vacate, alter or amend the consent order. On December 21, 1989, after the bankruptcy court denied this motion, the Debtor noted an appeal of this decision to the district court.
 
 
 12
 In the meantime, the Debtor located a potential buyer for the property. However, the sale was not consummated by August 28, 1989 and, therefore, the Debtor did not make the agreed payment as scheduled pursuant to the consent order. Apparently because the Debtor had located a potential buyer, WPJV nonetheless granted the Debtor additional time to sell the property and avoid foreclosure.
 
 
 13
 In February 1990, after the additional time afforded the Debtor expired, WPJV again instituted foreclosure proceedings, scheduling the foreclosure sale for March 23, 1990. On March 9, 1990, the Debtor filed an adversary proceeding with the bankruptcy court seeking specific performance of the release provision in the deed of trust. In addition, to prevent WPJV from foreclosing pending the potential sale of the property by the Debtor, the Debtor and the Committee each filed a complaint for injunctive relief and a motion for temporary restraining order with the bankruptcy court. On April 4, 1990, the bankruptcy court issued a preliminary injunction against the foreclosure sale.
 
 
 14
 The potential sale by the Debtor ultimately fell through. However, on July 25, 1990, the bankruptcy court issued a permanent injunction against the foreclosure sale since WPJV was unwilling to withhold the twenty-five-acre parcel from foreclosure. The injunction provided that WPJV could not go forward with a foreclosure sale until adjudication of the Debtor's pending specific performance claim against WPJV.
 
 
 15
 The Debtor and WPJV subsequently negotiated the Agreement, and on October 30, 1990, appeared before the bankruptcy court to put the general terms of the Agreement on record.[3] The Agreement provided that WPJV would give the Debtor six months, or until April 30, 1991, to complete the sale of the entire 126 acres and pay the secured claim of WPJV in full.[4] If the Debtor was unable to sell the property, WPJV would be permitted to foreclose on the entire 126 acres. In return for WPJV's forbearance, the Debtor agreed to dismiss, with prejudice, both the pending appeal from the bankruptcy court's denial of relief from the consent order and the Debtor's specific performance claim.
 
 
 16
 The Committee filed objections to the Agreement, as did another creditor, Robert Rohrbaugh. In its objections, the Committee argued that the grace period afforded by the Agreement provided only an illusory benefit, identifying primarily two reasons in support. First, the Committee contended that the Debtor's specific performance claim was strong and, given the permanent injunction against WPJV's foreclosure pending resolution of this claim, the Agreement did not impose any additional forbearance on WPJV. Second, because of the prevailing poor condition of the real estate market, the Committee asserted that the grace period specified by the Agreement did not provide adequate time for the Debtor to consummate a sale of the property.[5]
 
 
 17
 Unfortunately, the bankruptcy court did not conduct a hearing on the Committee's objections to the Agreement until March 28, 1991, some five months after the Debtor and WPJV had originally put the Agreement on record. This delay spawned an additional basis for the Committee to object to the Agreement. Specifically, the Committee argued that, because the Agreement did not become operative until after approval by the bankruptcy court and only required WPJV to refrain from foreclosing until April 30, 1991, the Agreement actually postponed foreclosure by approximately thirty days.
 
 
 18
 At the conclusion of the hearing, the bankruptcy court overruled the objections, holding "I am going to support the trustee's exercise of his business judgment that I have to recognize and his experience." (J.A. 93). In reaching this conclusion, the bankruptcy court opined:
 
 
 19
 Hardly a man alive would disagree that if the timing of the decision [to approve the Agreement] related to the time of the hearing ... both objections would have to be sustained without a second thought, but because of my view that we have to consider this as of the date of the compromise rather than the date of the hearing ... the objections are overruled.
 
 
 20
 (J.A. 93-94). The bankruptcy court added that it would be unfair to reject the Agreement since the Debtor had already received a large portion of the benefit provided by the Agreement, i.e., WPJV had refrained from foreclosing for some five months after the parties put the Agreement on record.
 
 
 21
 The Committee then appealed the bankruptcy court's approval of the Agreement to the district court. In addition to raising the same arguments as before, the Committee also asserted that the bankruptcy court should have evaluated the benefits provided by the Agreement as of the date of the hearing rather than the date the Agreement was put on record. The district court rejected the Committee's arguments, holding that the bankruptcy court did not abuse its discretion in approving the Agreement.
 
 
 22
 The Committee now appeals the approval of the Agreement to this court.
 
 II
 
 23
 The Committee first argues that the bankruptcy court applied an improper frame of reference in deciding whether to approve the Agreement. The Committee reasons that, in evaluating a proposed settlement agreement, the bankruptcy court must determine "whether the settlement agreement is in the best interest of the estate." Matter of Energy Co-Op, Inc., 885 F.2d 921, 927 (7th Cir.1989) (emphasis added). In the Committee's opinion, such an inquiry requires the bankruptcy court to evaluate the benefits to the estate at the time of the court hearing, rather than the potential benefits at the time the parties agreed to the settlement. In the present case, because the bankruptcy court evaluated the benefits to the estate at the time the Debtor and WPJV entered the Agreement, rather than at the court hearing, the Committee concludes that the bankruptcy court abused its discretion in approving the Agreement. We disagree.
 
 
 24
 To minimize litigation and expedite the administration of a bankruptcy estate, "[c]ompromises are favored in bankruptcy." 9 Collier on Bankruptcy p 9019.03 (15th ed.1993). However, this policy does not allow a bankruptcy court to give rubber stamp approval of a particular agreement. In re Planned Protective Services, Inc., 130 B.R. 94, 96 (Bankr.C.D. Cal.1991). Instead, the bankruptcy court must employ its "informed, independent judgment" to determine whether the settlement is both "fair and equitable." Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quotation omitted). Because "the bankruptcy judge is uniquely positioned to consider the equities and reasonableness of a particular compromise," we review the approval of a settlement for abuse of discretion. In re American Reserve Corp., 841 F.2d 159, 162 (7th Cir.1987).
 
 
 25
 Neither party cites any authority addressing the appropriate time reference for evaluating the benefits of a settlement to the bankruptcy estate. However, we conclude that the bankruptcy court's time reference in the present case did not amount to an abuse of discretion. We reach this conclusion because the time reference utilized by the bankruptcy court in its analysis best facilitates compromises, which the Bankruptcy Code favors. When, as in the present case, the parties exercise their business judgment and negotiate a settlement at arm's length without any hint of collusion, and that settlement offers potential benefits to the estate, we think the parties should not have to fear that subsequent developments will prevent approval of their agreement. Only under these circumstances will parties be encouraged to settle their disputes.
 
 
 26
 In contrast, the Committee's suggested approach unduly burdens the settlement process. Specifically, common sense suggests that parties would be hesitant to settle their claims with the daunting possibility that a court might later reject the agreement should subsequent developments make the agreement unfavorable for the estate. Moreover, the Committee's approach would unfairly benefit the estate. Specifically, such a rule would allow the estate to escape any settlement which proved to be disadvantageous before court approval, while depriving the opposing party of the reciprocal right. We decline to create a rule which destroys the mutuality of obligations, an inherent requirement in all contracts. E. Allen Farnsworth, Contracts 107 (1982).
 
 
 27
 Thus, when a proposed settlement offers benefits to the estate at the time the parties enter into the agreement, we think a bankruptcy court does not abuse its discretion by deferring to the business judgment of the parties who negotiated the compromise, especially when the parties negotiated at arm's length and there is no hint of collusion. Applied to the present case, we hold that the bankruptcy court did not abuse its discretion when it elected to evaluate the Agreement's potential benefits at the time the parties executed the Agreement rather than at the time of the court hearing.
 
 III
 
 28
 The Committee also argues that the Agreement provided only illusory benefits to the estate. The Committee reasons that the permanent injunction precluded WPJV from foreclosing on the property and, therefore, the Agreement only imposed approximately thirty days of forbearance on WPJV.[6] Because the Agreement imposed such a minimal additional burden on WPJV, the Committee concludes that the bankruptcy court abused its discretion in approving the Agreement. We disagree.
 
 
 29
 In determining whether to approve a proposed bankruptcy settlement agreement, a court's ultimate inquiry is "whether the settlement is in the best interest of the estate." Matter of Energy Co-Op, 885 F.2d at 927. "Central to ... [this] determination is a comparison of the settlement's terms with the litigation's probable cost and ... benefits." In re American Reserve Corp., 841 F.2d at 161. In other words:
 
 
 30
 The Court must examine the terms of the proposed settlement, in light of the risks and rewards of not settling, and determine whether the proverbial bird in the hand is worth two in the bush. While this is not and cannot be the subject of a rigid, mathematical analysis, there must, nonetheless, be some type of correspondence between what is being given in connection with the compromise and what might be received if the dispute was prosecuted to its ultimate conclusion.
 
 
 31
 Matter of Krizmanich, 139 B.R. 456, 460 (Bankr.N.D. Ind.1992).
 
 
 32
 Under these guidelines, the bankruptcy court in the present case did not abuse its discretion in approving the Agreement. Specifically, the Debtor's probability of succeeding on his specific performance claim was far from certain. Although the deed of trust required WPJV to release twenty-five acres, it also provided that the Debtor "will keep the ... premises in as good order and condition as they are now and will not commit or permit any waste thereof...." (J.A. 8). In response to the Debtor's specific performance claim, WPJV had asserted that the Debtor breached the deed of trust by "us[ing] the property as a dumping ground for construction materials and debris or at the very least allow[ing] dumping and waste to be committed on the subject property." (J.A. 38). If WPJV established such waste, the Debtor might have lost his specific performance claim.
 
 
 33
 In exchange for sacrificing an uncertain claim, the Agreement provided several tangible benefits to the estate. For example, the Agreement afforded the Debtor an opportunity to sell the entire 126 acres as one parcel rather than the mere twenty-five acres which the specific performance claim would have given the Debtor. This opportunity enhanced both the potential for selling the property and its likely sales price. Also, by postponing foreclosure the Agreement extended the time in which the Debtor could attract a potential buyer. Finally, the Agreement provided cost savings to the estate by avoiding legal fees on two fronts--litigating the specific performance claim and arguing the pending appeal from the bankruptcy court's denial of relief from the earlier consent order.
 
 
 34
 In recognizing the benefits provided by the Agreement, we reject the Committee's suggestion that the Agreement only provided a thirty-day grace period from foreclosure and should, therefore, be rejected. The Committee first argues that, because the Debtor and WPJV caused the five-month delay in the bankruptcy court's approval of the Agreement, we should view the Agreement as providing only a thirty-day grace period from foreclosure. We disagree. Although the Debtor and WPJV allowed twenty days, instead of ten, for creditors to file objections to the Agreement, we do not believe the additional ten days caused the five-month delay in gaining court approval of the Agreement. Instead, our review of the record suggests an overly crowded bankruptcy court docket caused the delay. Thus, we do not believe the Debtor and WPJV should be penalized for the delay.
 
 
 35
 The Committee next contends that the Agreement provided only a thirty-day grace period because, prior to the approval of the Agreement, the permanent injunction prohibited foreclosure. We disagree.
 
 
 36
 The permanent injunction lasted only until adjudication of the Debtor's specific performance claim. The Debtor and WPJV put the Agreement on record on October 30, 1990--the same day that trial of the specific performance claim was to commence. Thus, in all probability the permanent injunction would have expired long before March 28, 1991--when the bankruptcy court finally approved the Agreement. The delay in approving the Agreement, therefore, actually benefitted the Committee by extending the duration of the permanent injunction and allowing the Debtor additional time to consummate a sale of the entire 126 acres. Because the delay in approving the Agreement artificially prolonged the duration of the permanent injunction, we do not think the mere existence of that injunction vitiated the benefits resulting from the Agreement.
 
 
 37
 In summary, since the Agreement provided tangible benefits to the bankruptcy estate in return for the sacrifice of two uncertain claims against WPJV, the bankruptcy court did not abuse its discretion by approving the Agreement.
 
 IV
 
 38
 For the reasons stated herein, the decision of the district court, affirming the approval of the Agreement by the bankruptcy court, is affirmed.
 
 AFFIRMED
 
 
 [1]
 As a debtor in possession, the Debtor acted as the trustee for the estate pursuant to 11 U.S.C. Sec. 1107(a)
 
 
 [2]
 Many unsecured creditors of the Debtor did not receive notice of this consent order because the Debtor's then counsel failed to list them on the appropriate schedules
 
 
 [3]
 The parties appeared before the bankruptcy court on the same day the trial of the Debtor's specific performance claim was to commence
 
 
 [4]
 When the parties executed the Agreement, WPJV's claim totalled approxiamately $386,000 in principal and accrued interest
 
 
 [5]
 The Committee does not dispute that WPJV and the Debtor negotiated the Agreement at arm's length
 
 
 [6]
 According to the Committee, the thirty days ran from the date the bankruptcy court approved the Agreement, March 28, 1991, until April 30, 1991--the date the Agreement gave the Debtor to complete the sale of the property